UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Alexander Wood** | : |
| | : |
| v. | :  No. 3:02cv2058 (JBA) |
| | : |
| **Federal Bureau of Investigation** | : |
| **and U.S. Department of Justice** | : |

**Ruling on Defendant's Motion for Summary Judgment [Doc. # 19];
Plaintiff's Motion for Partial Summary Judgment [Doc. # 24];
Plaintiff's Motion for Continuance and Discovery Pursuant to
Federal Rule of Civil Procedure 56(f) [Doc. # 34]; Plaintiff's
Motion to Strike [Doc. # 39]; Plaintiff's Second Motion to Strike
[Doc. # 43]; Plaintiff's Third Motion to Strike [Doc. # 47].**

This case arises under the Freedom of Information Act ("FOIA"). Plaintiff Alexander Wood ("Wood"), a reporter for the Journal Inquirer newspaper of Manchester, Connecticut, requested documents from defendants the Federal Bureau of Investigation ("FBI") and the U.S. Department of Justice ("DOJ"), related to the investigation of FBI special agents who had been accused of misrepresenting information in arrest warrant affidavits submitted to United States Magistrate Judges. In response to Wood's FOIA request, the Department of Justice located two responsive records and released one document, but withheld in full a memorandum from the DOJ's Public Integrity Section under Exemptions 5, 6 and 7(C) of FOIA. The FBI located and released 447 pages of responsive documents, but redacted names and other identifying information on many of the documents pursuant to

1

exemptions 6 and 7(C) of FOIA. Wood challenges the withholding of the DOJ memorandum, and seeks the release of information identifying the government employees investigating the alleged misconduct, and identifying Supervisory Special Agent Ralph A. DiFonzo Jr. as the subject of disciplinary action or as the subject of any personnel appeal.

Pending before the Court are Defendant's Motion for Summary Judgment [Doc. # 19]; Plaintiff's Motion for Partial Summary Judgment [Doc. # 24]; Plaintiff's Motion for Continuance and Discovery Pursuant to Federal Rule of Civil Procedure 56(f) [Doc. # 34]; Plaintiff's Motion to Strike [Doc. # 39]; Plaintiff's Second Motion to Strike [Doc. # 43]; and Plaintiff's Third Motion to Strike [Doc. # 47].

For the reasons discussed below, the Court concludes that the DOJ memorandum was properly withheld as work product under Exemption 5, and that the names of the FBI and DOJ employees involved in the investigation were properly withheld under Exemption 7(C), but not under Exemption 6. In addition, the Court finds that information identifying Special Agent DiFonzo is not exempt from disclosure. Accordingly, defendant's Motion for Summary Judgment [Doc. # 19] is GRANTED in part and DENIED in part, and plaintiff's Motion for Partial Summary Judgment [Doc. # 24] is GRANTED in part and DENIED in part. Plaintiff's Motion for Continuance and Discovery [Doc. # 34] is DENIED, as the two

declarations submitted by the Department of Justice contained reasonable specificity of detail adequate to meet the Government's burden, and carry a presumption of good faith. Finally, because the Court relied on the evidence in the record, not the 56(a)(2) statement, found the factual statements in the defendants' declarations supported by personal knowledge, and did not rely on the unsupported conclusions or legal opinions contained in the declarations, plaintiff's three motions to strike [Docs. ## 39, 43, 47] are DENIED.

**I.  Background**

In July 1996, Gregory B. Dillon, a Supervisory Inspector in the Connecticut Chief State's Attorney's Office, who participated in a joint state-federal task force known as the Connecticut Fugitive Task Force (CFTF), accused several FBI agents assigned to the CFTF of falsifying information in arrest warrant affidavits submitted to United States Magistrate Judges.  See Declaration of Gregory B. Dillon, Feb. 21, 2003 [Doc. # 25, Ex. B] at ¶¶ 5-7.  Investigations followed in the Department of Justice's Public Integrity Section and the FBI's Office of Professional Responsibility, after which the DOJ declined criminal prosecution, and the FBI imposed administrative discipline which included, for one agent, a five day suspension and six month probation that was later reduced, on administrative appeal, to a letter of censure.

Wood's FOIA request, filed in November 1998, requested all documents related to the investigation of these accusations. See Letter from Alexander Wood to Department of Justice, Criminal Division, Office of FOIA, November 2, 1998 [Doc. # 14, Ex. 1]; see also Letter from Alexander Wood to Thomas J. McIntyre, January 7, 1999 [Doc. # 14, Ex. 3] (supplementing original FOIA request). The DOJ's Criminal Division processed Wood's request and forwarded it to the Office of Professional Responsibility, the Federal Bureau of Investigation, and the Executive Office of U.S. Attorneys. See Memorandum from Thomas J. McIntrye, Chief FOI/PA Unit, Office of Enforcement Operations, Criminal Division, to Richard Rogers, Office of Professional Responsibility, November 17, 1998 [Doc. # 14, Ex. 2].

**The Department of Justice Response:**

In response to Wood's request, DOJ released two records on July 21, 1999 from the Office of Professional Responsibility after redacting the name of the FBI Special Agent under investigation pursuant to 5 U.S.C. § 552(b)(6) and (7)(C). See Letter of Thomas McIntyre to Alex Wood, July 21, 1999 [Doc. # 14, Ex. 5]. The documents released included a letter from the DOJ's Public Integrity Section and a memorandum of the Office of Professional Responsibility, both stating that the Public Integrity Section had completed its review of the allegations of misconduct by members of the FBI's Connecticut Fugitive Task

Force ("CFTF") and decided not to prosecute the agents, and that administrative discipline of the CFTF's coordinator was being considered.[1]

On December 20, 2001, the DOJ informed Wood that a search of the Public Integrity Section records revealed two documents responsive to his request, including one that had previously been released to Wood, and one which was being withheld in full pursuant to 5 U.S.C. § 552(b)(5), (6), and (7)(C) & (D). The letter informed Wood that the document being withheld was a 14 page Memorandum dated December 2, 1997 by James Cooper and John Scoot, Trial Attorneys, Public Integrity Section to Lee Radek, Chief, Public Integrity Section ("DOJ Memo"). See Letter from Thomas J. McIntyre to Alex Wood, December 20, 2001 [Doc. # 14, Ex. 6]. Wood filed an administrative appeal of the DOJ's partial denial of his FOIA request, and his appeal was denied on October

---

[1] See Letter from Lee J. Radek, Chief, Public Integrity Division to Richard M. Rogers, Acting Counsel, office of Professional Responsibility, January 8, 1998 [Doc. # 14, Ex. 5] ("The Public Integrity Section has completed its review of allegations of misconduct by members of the Federal Bureau of Investigation's Connecticut Fugitive Task Force (CFTF). We have determined that prosecution of the agents is not warranted. As we have discussed with FBI OPR representatives, administrative discipline of the CFTF's coordinator, Special Agent [b6, 7C] is under consideration. Our file is closed."); see also Department of Justice, Office of Professional Responsibility Incoming Coversheet [Doc. # 14, Ex. 5] ("1/12/98: By letter to OPR dated 1/8/98, PIS/CRM Chief Radek informed that office has determined that the prosecution of the agents is not warranted. As discussed with FBI/OPR, administrative discipline of SA [b6, 7C] is under consideration. PIS/CRMs file is closed.").

5

3, 2002. <u>See</u> Letter of Alexander Wood to Office of Information and Privacy, U.S. Department of Justice, February 25, 2002 [Doc. # 14, Ex. 7]; Letter from Richard Huff, Co-Director, Office of Information and Privacy, to Alexander Wood, October 3, 2002 [Doc. # 14, Ex. 12].[2] Wood's suit, brought in this court on November 20, 2002, challenges the withholding of the DOJ Memo under Exemption 5.

**The FBI Response:**

After Wood's FOIA request was forwarded to the FBI, the FBI located 447 non-duplicate pages of responsive documents, and released 254 pages in full and 193 pages in part. <u>See</u> Declaration of Carol L. Keeley, Assistant Section Chief,

---

[2] On February 25, 2002, Wood also wrote to Thomas McIntyre, Chief of the FOIA/PA unit, stating that McIntyre's December 20, 2001 letter partially denying his FOIA request contained no reference to the issue of discretionary release of the memorandum at issue. <u>See</u> Letter of Alexander Wood to Thomas McIntyre, February 25, 2002 [Doc. # 14, Ex. 9]. By letter dated April 9, 2002, McIntyre informed Wood that "Although Attorney General Reno's discretionary disclosure policy was repealed by a memorandum of Attorney General Ashcroft dated October 12, 2001, I have nevertheless again examined the single document at issue. After reviewing this document I have concluded that there is an ample legal basis to withhold it pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5). Moreover, there is no question is my mind that disclosure of this type of material would have a profoundly adverse effect on the ability of departmental attorneys to express their candid legal opinions with regard to significant legal and policy matters. Consequently, I am unable to conclude that this document should be disclosed, even under the standards prevailing at the time your request was made." <u>See</u> Letter of Thomas McIntyre to Alexander Wood, April 9, 2002 [Doc. # 14, Ex. 11].

Record/Information Dissemination Section, Records Management Division, Federal Bureau of Investigation, May 28, 2003 [Doc. # 15] at ¶ (9) n. 4-5. The released documents included reports of interviews undertaken in the course of the investigation, reports of factual findings by the investigators, analyses of relevant law, correspondence of various officials within the FBI and DOJ regarding the status of the investigation, the decision from the Adjudication Unit of the FBI's Office of Professional Responsibility, the letters to the accused special agents setting forth the administrative discipline ordered, the appeal of the special agent who received a five day suspension, and the decision, on appeal, reducing the five day suspension to a letter of censure. The documents disclosed the names of the special agents under investigation and the findings of the investigation, but redacted the names of the special agents when connected to a specific finding or to the specific form of discipline each received. See generally Notice of Filing of Release (Section 1) [Doc. #17]; Notice of Filing of Release (Section 2, Section 1A and Referrals) [Doc. # 18]. The documents also revealed the names of the higher-level officials responsible for the investigations and the ultimate decisions regarding the accused agents, but redacted the names and other information identifying other employees of the FBI and DOJ involved in the investigation. See id. All of the redactions were made pursuant to exemptions 6

7

and 7(C) of FOIA. In this suit, Wood challenges the withholding of information identifying the FBI and DOJ employees involved in the investigation, and identifying Supervisory Special Agent Ralph A. DiFonzo as the subject of disciplinary action or the subject of any personnel appeal.

## II. Standard

FOIA establishes "'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" National Labor Relations Board v. Sears, Roebuck & Co., 421 U.S. 132, 136 (1975) (quoting S. Rep. 813, 89th Cong., 1st Sess., 3 (1965)). Judicial review of an agency's response to a FOIA request is de novo. See Hopkins v. Dept' of Housing and Urban Development, 929 F.2d 81, 83 (2d Cir. 1991).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of

8

Justice, 19 F.3d 807, 812 (2d Cir. 1994) (citing 5 U.S.C. § 552(a)(4)(B); EPA v. Mink, 410 U.S. 73, 79 (1973)). Exemptions are to be construed narrowly. See id. Summary judgment may be granted on the basis of agency affidavits "if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." Grand Central Partnership, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation omitted) (emphasis omitted).

## III. Discussion

### A. DOJ Memorandum: Exemption 5

Exemption 5 of FOIA protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). Under Exemption 5, therefore, documents that would not be subject to discovery in private litigation, such as those protected by the attorney-client privilege, work product privilege, or executive privilege, are properly withheld by the agency. See Grand Central Partnership, Inc., 166 F.3d at 481.

The "executive privilege," or "deliberative process privilege," is meant to protect the "decision making processes of

9

government agencies." See NLRB, 421 U.S. at 150 (internal quotation omitted). The exemption of deliberative documents is designed to aid executive decisionmaking by:

> assur[ing] that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; . . . protect[ing] against premature disclosure of proposed policies before they have been finally formulated or adopted; and . . . protect[ing] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

Grand Central Partnership, 166 F.3d at 481. (internal quotation omitted).

To fall within the deliberative process privilege, a document must be both "pre-decisional," that is, "prepared in order to assist an agency decisionmaker in arriving at his decision," and "deliberative," or "actually . . . related to the process by which policies are formulated." Grand Central Partnership, 166 F.3d at 482 (internal quotation omitted).

Exemption 5 also protects attorney work product, which include materials prepared in anticipation of litigation. See Hickman v. Taylor, 329 U.S. 495, 510-11 (1947). A document is considered prepared "in anticipation of litigation" if "'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" U.S. v. Adlman, 134 F.3d 1192, 1202 (2d Cir. 1998) (quoting

10

Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)). Litigation need not result. Thus, "the reports and recommended action with respect to the status of an investigation submitted before any final decision is made as to the course an investigation qualify as documents prepared in anticipation of litigation." A Michael's Piano, Inc. v. Federal Trade Commission, 18 F.3d 138, 146-47 (2d Cir. 1994).

At its core, the work product privilege protects the "memoranda prepared by an attorney in contemplation of litigation which set forth the attorney's theory of the case and his litigation strategy." NLRB, 421 U.S. at 154. Much like the deliberative process privilege, the work product privilege is based on the assumption that the provision of legal advice or the preparation for trial would not be efficient, frank, or fair if there was a risk that the attorney's thoughts or strategy would be revealed. See Hickman, 329 U.S. at 510. Unlike the deliberative process privilege, however, a document need not be "deliberative" to qualify as work product. Under the civil discovery rules, the work product privilege includes factual as well as deliberative materials prepared in anticipation of litigation. The civil rules allow disclosure of factual work product only upon showing of "substantial need," and provide

11

heightened protection for deliberative materials.[3] See Fed. R. Civ. P. 26(b)(3); A Michael's Piano, Inc., 18 F.3d at 146; Tax Analysts v. Internal Revenue Service, 117 F.3d 607, 620 (D.C. Cir. 1997). The "test" for Exemption 5 is "whether information 'would routinely be disclosed in private litigation.'" A Michael's Piano, 18 F.3d at 146 (quoting NLRB, 421 U.S. at 149 n. 16)(internal quotation omitted). Under FOIA, therefore, all work product is exempt, regardless of whether it is factual or deliberative.

Here, the government seeks to withhold in full a 14 page memorandum dated December 2, 1997 by two trial attorneys in the DOJ's Public Integrity Section to Lee Radek, Chief of the Public Integrity Section ("DOJ Memo"). See Letter from Thomas J. McIntyre to Alex Wood, December 20, 2001 [Doc. # 14, Ex. 6]. The Government asserts that both the deliberative process and work product privileges apply and satisfy the requirements of Exemption 5. In support, the Government has submitted a declaration and supplemental declaration by Joseph S. Beck, a litigation attorney for the DOJ Criminal Division's Freedom of

---

[3] Fed. R. Civ. P. 26(b)(3) allows discovery of materials "prepared in anticipation of litigation or for trial" "only upon a showing that the party seeking discovery has substantial need of the materials." But even if the required showing has been made, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

Information Act/Privacy Act Unit. <u>See</u> Declaration of Joseph S. Beck, May 28, 2003 [Doc. # 14] at ¶ 1; Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc. # 45, Ex. A] at ¶1. Beck describes the DOJ memo as

> a communication from two Public Integrity Section staff attorneys to the Chief of their section. This document contains a discussion concerning the allegations of misconduct and the investigation of the allegations and sets forth the attorneys' analysis, theories, recommendations and discussion of significant issues and facts used to evaluate the matter. This document therefore reflects the attorneys' thoughts, impressions, and understanding of factors to be considered in the course of reviewing and making prosecutive decisions as well as specific facts selectively relied upon by the attorneys.

Declaration of Joseph S. Beck, May 28, 2003 [Doc. # 14] at ¶ 23.

Beck states that the memo was prepared "for the express purpose of giving [the staff attorneys'] analyses and opinions on contemplated litigation," and that the memo "was used for the sole purpose of determining whether criminal prosecution of the FBI agents under investigation in this case was warranted." Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc. # 45, Ex. A] at ¶¶ 4, 5. According to Beck, the Public Integrity Section made a final decision to decline prosecution after the memo was completed. As he explains: "The face of the memo bears a handwritten notation: 'Declined JG for LJR 12/30/97.' This notation signifies that Joseph Gangloff, then Principal Deputy Chief of the Public Integrity Section, had declined prosecution as acting chief of the section in the absence of Lee J. Radek,

the section chief." Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc. # 45, Ex. A] at ¶6.

Wood argues that the Beck declarations fail to demonstrate that the DOJ memo was properly withheld under Exemption 5. First, relying on Fed. R. Civ. P. 56(e),[4] he argues that several portions of the declarations should be stricken because they lack foundation as to Beck's basis of knowledge or are speculative.[5] See Plaintiff's Plaintiff's Second Motion to Strike [Doc. # 43]; Plaintiff's Third Motion to Strike [Doc. # 47]. In particular, of those portions cited above, Wood has moved to strike the statement that the memo "was used for the sole purpose of determining" whether criminal prosecution was warranted, and the statement interpreting the handwritten note on the memo. As to the first statement, Wood argues that Beck provides no basis for purporting to know all purposes for which the DOJ Memo was used over a more than five year time period. As to the second, Wood states that the handwritten note is ambiguous, and that Beck provides no basis for his interpretation.

---

[4] Fed. R. Civ. P. 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

[5] Wood also argues that the portions of the declarations that contain no more than legal argument or conclusion should be stricken. The Court has relied only on the factual assertions, not the legal argument, in the declarations.

14

Beck's declaration states that he is responsible for reviewing the FOIA processing files that have been compiled, and consulting with the FOIA Unit Chief and with the supervisory paralegals to confirm that determinations to withhold or to release records of the Criminal Division accord with the requirements of FOIA. See Beck Declaration [Doc. # 14] at ¶ 2. Beck also affirms, "I make this declaration on the basis of information acquired through the performance of my official duties." Id. at ¶ 3; Beck Supplemental Declaration [Doc. # 45, Ex. A] at ¶ 2. "Affidavits submitted by an agency are accorded a presumption of good faith." Carney, 19 F.3d at 812 (internal quotation omitted). Moreover, generally an "affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e)." Id. at 814 (citations omitted). Here, Beck's declaration establishes that he is an attorney in the Criminal Division, that he personally reviewed the DOJ memo in question, and that he acquired the information in the declaration as part of his official duties. By reviewing the memo at issue, Beck would be able to ascertain the purpose for which it was written, and the handwritten note on top reveals how the memo was used. Although Wood argues that the handwritten note is ambiguous, Beck's statement that he acquired the information in the performance of his official duties is sufficient, when interpretation of the note requires no more than

15

knowledge of the personnel and business practices of the Division. Beck's declaration thus provides a sufficient basis for finding personal knowledge under Fed. R. Civ. P. 56(e).[6]

Second, Wood argues that discovery is necessary before he can successfully challenge the Government's withholding of the memo, because the Beck declarations leave unanswered several important questions about whether the memo was produced before the decision was made to decline prosecution, whether the memo was prepared because of the prospect of litigation, whether the memo was adopted as policy by the DOJ, and whether any privileges were waived. See Plaintiff's Motion for Continuance and Discovery Pursuant to Federal Rule of Civil Procedure 56(f) [Doc. # 34]. "[D]iscovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face. When this is the case, the district court may 'forgo discovery and award summary judgment on the basis of the affidavits.'" Carney, 19 F.3d at 812 (citations omitted). If the agency declarations are sufficient to meet the government's

---

[6] Wood has also moved to strike several statements in Defendants' Local Rule 56(a)(2) Statement on grounds that the statements are unsupported by the record. See Plaintiff's Motion to Strike [Doc. # 39]. It deciding a summary judgment motion, however, it is necessary to look to the record evidence, and inappropriate to rely on the 56(a)(2) statement. See Giannullo v. City of New York, 322 F.3d 139, 142 (2d Cir. 2003). As the Court has relied only on the underlying evidence, not defendant's 56(a)(2) statement, plaintiff's motion is denied as moot.

16

burden, then the burden shifts to the plaintiff to "make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." Id. (citations omitted). It is necessary, therefore, to assess the adequacy of the Government's submission as support for its withholding under Exemption 5, and to determine whether the plaintiff has contradictory evidence or evidence of bad faith. Because the work product and deliberative process privileges are independent bases for Exemption 5, the Court will address first the work product privilege, dealing with each of Wood's challenges in turn.

### 1. Timing of the DOJ Memo

As discussed above, a memo prepared after a final decision to decline prosecution was made could not be deemed prepared "in anticipation of litigation." See A Michael's Piano, Inc., 18 F.3d at 146-47. Because the work product privilege here applies only to a pre-decisional document, the central question in dispute in this case is whether the DOJ memo was prepared prior to the final decision to decline prosecution. Beck's declarations, which establish that the DOJ Memo was prepared on December 2, 1997 for the purpose of determining whether to pursue criminal prosecution of the FBI agents, and that the Principal

Deputy Chief of the Public Integrity Section, writing on behalf of the section chief, declined prosecution on December 30, 1997, if accepted, are sufficient to meet the government's burden of showing that the memo was pre-decisional.

Wood challenges the Government's declarations, and states that two Case Update Forms prepared by the FBI at the time the Public Integrity Section reviewed the matter cast doubt on Beck's conclusion that a final decision to decline prosecution was made on December 30, 1997, approximately one month after the DOJ Memo was submitted. See Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc. # 45, Ex. A] at ¶6. First, Wood points to a Case Update Form dated November 20, 1997, which indicates that, on that date, a "Unit Chief" discussed the case with Joshua R. Hochberg, the Deputy Chief of the Public Integrity Section, and that Hochberg "advised captioned case was now assigned to John Scott and a prosecutive opinion will be rendered in one week. He said the Public Integrity Section will probably decline prosecution in this matter." See Notice of Filing of Release (Section 1) [Doc. # 17] at 397 (Case Update Form, Nov. 20, 1997). Wood argues that Hochberg's prediction that prosecution would "probably" be declined suggests that substantive discussions with the decision-maker had likely already taken place and thus the decision may have been made, with the memo a mere formality. Second, Wood notes that a Case Update Form dated December 11,

18

1997 states: "UC (deletion) spoke with Public Integrity Section Attorney James Cooper regarding this matter. Mr. Cooper said that a declination memorandum has been prepared in this matter. OPR will be advised when the declination has been approved at the Public Integrity Section." See Notice of Filing of Release (Section 1) [Doc. # 17] at 398 (Case Update Form, December 11, 1997). Here, Wood focuses on the use of the word "when," which he argues indicates that "Cooper conveyed to the UC complete confidence that the declination would be approved, indicating that the actual decision had been made by December 11, 1997." Plaintiff's Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for a Continuance and Discovery [Doc. # 54] at 6.

The evidence on which Wood relies fails to rebut the government's declarations. At most, the Case Update Forms indicate that substantive discussions within the Public Integrity Unit had taken place prior to the drafting of the DOJ Memo, and that a preliminary decision was reached to decline prosecution. But, as the use of the words "probably," and "when," to refer to the ultimate decision to decline prosecution plainly indicates, the final decision had not yet been made at the time the Case Update Forms were written. For the purposes of determining whether the work product privilege applies when litigation does not result, it is only the final decision by the ultimate

19

decisionmaker that is significant.

The Second Circuit considered an analogous challenge in which "some of the withheld documents may have been prepared in anticipation of closing the investigation" in A Michael's Piano, 18 F.3d at 146. The Court there concluded that the work product privilege applied as long as the investigation had not yet been closed at the time the documents were prepared. See id. ("[T]he fact that staff members may have thought that litigation might not ever occur does not take the documents out of the scope of those materials exempt because they were created in anticipation of litigation."). Like A Michael's Piano, here the record establishes that the investigation had not yet been closed at the time the memo from the Public Integrity Section staff attorneys was submitted to the section chief on December 2, and in fact after the memo's submission one of its authors continued to wait for the declination to be "approved" by his superiors. See Case Update Form, December 11, 1997 [Doc. # 17] at 398; see also Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980) ("The identity of the parties to the memorandum is important; a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made.").