Wood also argues that the identity of the ultimate decision-maker is unclear from the record.  Beck's declaration states, however, that the notation on the memo stating "Declined JG for LJR 12/20/97" signifies that "Joseph Gangloff, then Principal Deputy Chief of the Public Integrity Section, had declined prosecution as acting chief of the section in the absence of Lee J. Radek, the section chief."  Supplemental Declaration [Doc. # 45, Ex. A] at ¶ 6.  While there might be a question about the ultimate decision-maker if a DOJ unit other than the Public Integrity Section was also responsible for deciding whether to prosecute, there is no suggestion here that any other unit had such authority.  The documents Wood points to uniformly establish that the Public Integrity Section was responsible for making the final decision on whether to pursue criminal prosecution.  <u>See</u> Memorandum of Office of Professional Responsibility, Federal Bureau of Investigation, Jan. 5, 1998 [Doc. # 18] at 409 ("On 1/5/98, the PIS/DOJ telephonically advised the prosecution has been declined"); Letter from Lee Radek, Chief, Public Integrity Section to Richard Rogers, Acting Counsel, Office of Professional Responsibility, Jan. 8, 1998 ("The Public Integrity Section has completed its review . . . .  We have determined that prosecution of the agents is not warranted . . . .  Our file is closed.").  Wood offers no grounds for calling into question Beck's statement that the Deputy Chief of the Public Integrity Section declined

21

prosecution on the section chief's behalf.

**2.  Preparation of Memo "Because of the Prospect of Litigation"**

Wood argues that discovery is needed on the purposes for which the DOJ Memo was prepared, because it is conceivable that the memo "was prepared for reasons entirely apart from the prospect of litigation," for example, for "a perceived need to be prepared to answer any future questions about this matter from Congress or higher-level officials in the executive branch." Memorandum in Support of Plaintiff's Motion for Continuance and Discovery [Doc. # 35] at 20.  Beck's declaration clearly states, however, that the memo was prepared "for the express purpose of giving [the staff attorneys'] analyses and opinions on contemplated litigation." Supplemental Declaration [Doc. # 45, Ex. A] at ¶ 4.  This meets the government's burden of showing the memo was prepared in anticipation of litigation, and Wood would need more than mere speculation to rebut the conclusion.  <u>See</u> <u>Carney</u>, 19 F.3d at 813.

**3.  Adoption or Incorporation by Reference**

Wood also seeks discovery in order to determine whether any FBI employee was permitted to read the DOJ memo for guidance in the analysis of the legal issues the FBI considered during the disciplinary process.  With this evidence, Wood seeks to invoke an exception to Exemption 5, namely, that the agency has incorporated by reference an intra-agency memorandum into final

22

agency policy.

The Government has asserted that the "incorporation by reference" exception does not apply to work product. The doctrine was first established in the Supreme Court's decision in <u>NLRB v. Sears</u>, in which the Court held that "[i]f any agency chooses expressly to adopt to incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5." <u>NLRB</u>, 421 U.S. at 161. The incorporation by reference doctrine is meant to ensure that all deliberative documents that became the agency's final policy or opinion on the issue are disclosed. The Court in <u>NLRB</u>, however, also found that a memorandum that might otherwise be deemed a final opinion, necessitating disclosure under FOIA, would nonetheless be protected as work product when the decisionmaker used the decision to litigate the case. <u>See</u> <u>id</u>. at 160. Thus, the Court concluded that the NLRB General Counsel's Advice and Appeals Memoranda, which "explain a decision already reached by the General Counsel which has real operative effect--it permits litigation before the Board," <u>id</u>., were properly withheld under FOIA because the General Counsel was a litigating party to the case with respect to which he had made the decision.

As the Supreme Court later clarified, "the kind of mutually

23

exclusive relationship between final opinions and statements of policy, on one hand, and predecisional communications, on the other, does not necessarily exist between final statements of policy and other Exemption 5 privileges." <u>Federal Reserve v. Merill</u>, 443 U.S. 340, 360 n.23 (1979). Moreover, because the work product exemption is construed as a "categorical rule," and Courts thus are not at liberty to order the disclosure of work product even when civil discovery rules would allow disclosure given the particular facts of the underlying litigation, the status of the litigation does not affect the applicability of the work product exemption. <u>See</u> <u>FTC v. Grolier, Inc</u>., 462 U.S. 19, 28 (1983). Interpreting these principles, several courts have concluded that "even if a document is a final opinion or is a recommendation which is eventually adopted as the basis for agency action, it retains its exempt status if it falls properly within the work-product privilege. . . . [A]ny argument to the effect that the attorney's opinions in question may have become the basis for final agency action is irrelevant for the purposes of the work-product privilege." <u>Iglesias v. CIA</u>, 525 F.Supp. 547, 559 (D.D.C. 1981); <u>see also</u> <u>Exxon Corp. v. F. T. C</u>., 476 F.Supp. 713, 726 (D.D.C. 1979).

The facts here also do not support Wood's argument. Wood suggests only that the DOJ memo may have been incorporated in the decision of the FBI's OPR Adjudication Unit, because the FBI may

have reviewed the DOJ memo in preparing its decision.  The OPR

decision, however, nowhere references the DOJ Memo.  <u>See</u> OPR

Adjudication Unit Addendum [Doc. # 18] at 422-452.

"Incorporation by reference" thus is not a viable theory in this

case, and Wood's request for discovery on this issue is

accordingly denied.

### 4.  Waiver

Finally, Wood seeks discovery on whether the DOJ waived the

work product privilege by communicating the contents of the memo

to Michael Wolf, Special Agent in Charge of the FBI's New Haven

Field Office, for use in a press interview.  If so, he argues,

the agency waived the Exemption 5 privilege by publicly

disclosing the contents of the memorandum.

"[D]isclosure of work-product materials can waive the

privilege for those materials if such disclosure, under the

circumstances, is inconsistent with the maintenance of secrecy. .

. ." <u>Rockwell Intern. Corp. v. U.S. Dept. of Justice</u>, 235 F.3d

598, 605 (D.C. Cir. 2001) (internal quotation omitted).  It is

generally necessary, therefore, to examine the scope and

specificity of the disclosure.  <u>See</u> <u>Dow Jones & Co., Inc. v. U.S.</u>

<u>Dept. of Justice</u>, 880 F.Supp. 145, 150-51 (S.D.N.Y. 1995)(vacated

in part on other grounds, <u>Dow Jones & Co., Inc. v. U.S. Dept. of</u>

<u>Justice</u>, 907 F.Supp. 79 (S.D.N.Y. 1995)); <u>Mehl v. EPA</u>, 797

F.Supp. 43, 47 (D.D.C. 1992).

25

In a May 1999 interview with the <u>New Haven Register</u>, Wolf stated that the arrest warrants at issue contained "procedural errors," "misrepresentation of immaterial facts," and no "intentional misrepresentation of material facts."  <u>See</u> Declaration of Christian Miller, April 25, 2003 [Doc. # 35, Ex. A] at ¶ 10; Christian Miller, <u>FBI Tightens Fugitive Arrest Warrant Process</u>, New Haven Register, May 16, 1999, at A4.  Wolf has affirmed, however, in a declaration to this Court, that he had not reviewed the DOJ memo at the time of his interview with the New Haven Register, and that he has never seen the memo at issue.  <u>See</u> Declaration of Michael Wolf, August 15, 2003 [Doc. # 45, Ex. B] at ¶¶ 5, 6.  Wolf thus never expressly referenced the memo at issue, and did not provide any specific information from the memo.[7]  Under the circumstances of this case, then, there was no waiver of the work product privilege.

Because the Court finds that the Government has met its burden of showing that the work product privilege applies, and Wood's evidence has not contradicted the government's evidence or otherwise called the credibility of the declarants into question, Wood is not entitled to discovery.  The Court concludes that the Government was permitted to withhold the DOJ memo under Exemption 5.

---

[7]The Court has reviewed the DOJ memo <u>in camera</u>, comparing the memo with the newspaper article in question.

**B.   FBI Release:   Exemptions 6 and 7(C)**

The FBI responded to Wood's FOIA request by releasing all responsive documents, but redacting the names of certain government employees, as well identifying information linking the FBI agents who were subjects of the investigation to specific findings or specific forms of discipline.   For each redaction, the FBI invoked the two privacy exemptions under FOIA.   Exemption 6 of FOIA allows the withholding of "(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).   Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

There are important distinctions in the two exemptions. Exemption 6 covers only personnel, medical, and "similar" files, which is interpreted to mean "'detailed Government records on an individual which can be identified as applying to that individual.'"   United States Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982) (quoting H.R. Rep.No. 1497, 89th Cong., 2nd Sess., 11 (1966), U.S. Code Cong. & Admin. News 1966, p. 2428).   Exemption 7(C) applies only when the record was

27

"compiled for law enforcement purposes."  An agency's investigation of its own employees, as is the subject of Wood's FOIA request, "is for 'law enforcement purposes' only if it focuses directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions." <u>Stern v. FBI</u>, 737 F.2d 84, 89 (D.C. Cir. 1984)(internal quotation omitted); <u>see also</u> <u>Perlman v. United States Dep't of Justice</u>, 312 F.3d 100, 105 (2d Cir. 2002) (report of investigation prepared in connection with investigation into whether agency employee "committed acts that could subject that employee to criminal or civil penalties" was prepared for "law enforcement purpose").  However, "an investigation conducted by a federal agency for the purpose of determining whether to discipline employees for activity which does not constitute a violation of law is not for 'law enforcement purposes' under Exemption 7." <u>Stern</u>, 737 F.2d at 90.

Moreover, while both of these exemptions require the Court to balance the public interest in disclosure against the privacy interests of the individuals, the balancing test is not the same for each.  As the Supreme Court explained in <u>U.S. Dept. of Justice v. Reporters Committee For Freedom of Press</u>, 489 U.S. 749 (1989):

> Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6 in two respects. First, whereas Exemption 6 requires that the invasion

28

of privacy be "clearly unwarranted," the adverb
"clearly" is omitted from Exemption 7(C). This omission
is the product of a 1974 amendment adopted in response
to concerns expressed by the President. Second, whereas
Exemption 6 refers to disclosures that "would
constitute" an invasion of privacy, Exemption 7(C)
encompasses any disclosure that "could reasonably be
expected to constitute" such an invasion. This
difference is also the product of a specific amendment.
Thus, the standard for evaluating a threatened invasion
of privacy interests resulting from the disclosure of
records compiled for law enforcement purposes is
somewhat broader than the standard applicable to
personnel, medical, and similar files.

Id. at 756.

Accordingly, the Government has a tougher burden to establish

that withholding is proper under Exemption 6 than it does under

Exemption 7(C).

    Here, the Government has asserted both exemptions for every

name redacted in the released documents.  But each exemption does

not always apply.  As is clear from the preceding discussion, the

decision declining criminal prosecution of the FBI agents was

made on December 30, 1997.  Any records prepared after that date,

therefore, by definition cannot relate to the investigation into

whether the agents committed acts that could subject them to

criminal penalties.  Indeed, once the DOJ closed its criminal

investigation, the case was referred back to the FBI to consider

only administrative discipline.  It is clear from the caselaw

that records of investigations into violations of agency policy

that are not subject to criminal penalty, are not prepared for

"law enforcement purposes."  Therefore, the Court will first

29

examine Wood's challenge under Exemption 7(C), to determine whether the redactions on those records prepared prior to December 30, 1997 are exempt.  The Court will then determine whether Exemption 6 applies to those records prepared after December 30, 1997.

### 1.  Exemption 7(C)

Wood first challenges the withholding of information, other than direct telephone numbers, identifying any employee of the defendants involved in the investigation of the FBI agents accused of falsifying information in arrest warrant applications, or involved in the decision-making resulting from that investigation.  The issue under Exemption 7(C) is whether disclosure of the identities of these employees "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).  "[W]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny." Reporters Committee, 489 U.S. at 772 (internal quotation omitted).  It is necessary, then, to balance the privacy and public interests at stake.

The Government has submitted a declaration by Carol L. Keeley, Assistant Section Chief in the Record/Information Division of the FBI which states that the identities of the FBI

30

special agents conducting the investigation were withheld because

> their assignment to investigations is not by choice and
> any type of publicity concerning any particular
> investigation may seriously prejudice their
> effectiveness in conducting future investigations. . .
> FBI SAs conduct official inquiries into violations of
> various criminal statutes and in national security
> cases.  They come into contact with all strata of
> society. . . .  Those who were the focus on such
> official acts by FBI SAs may carry grudges which last
> for years and they may seek any excuse to harass the
> SAs involved in the investigation of themselves.[8]

Keeley Declaration [Doc. # 15] at ¶ 22.

Keeley also asserts that the identities of the other FBI and DOJ

employees were withheld because they may become targets of

"harassing inquiries."  Id. at ¶¶ 23, 26-27.

Under Exemption 7(C), it is well established that law

enforcement officials acting in their official capacities have at

least some claim to privacy.  As the D.C. Circuit explained in

Lesar v. U.S. Dep't. of Justice, 636 F.2d 472 (D.C. Cir. 1980):

> In their capacity as public officials FBI agents may
> not have as great a claim to privacy as that afforded
> ordinarily to private citizens, but the agent by virtue
> of his official status does not forgo altogether any

---

[8]Wood seeks to strike much of Keeley's declaration as
lacking in personal knowledge.  Keeley has affirmed in her
declaration, however, that her statements "are based upon my
personal knowledge, upon information made available to me in my
official capacity, and upon conclusions and determinations
reached and made in accordance therewith."  Keeley Declaration
[Doc. # 15] at ¶ 3.  Moreover, while some of Keeley's statements
are conclusory, the concern that release of the names of
investigators might lead to harassment is one which is widely
reflected in the caselaw.  See, e.g. Lesar v. U.S. Dep't of
Justice, 636 F.2d 472, 487 (D.C. Cir. 1980); Dunkelberger v.
Department of Justice, 906 F.2d 779, 781 (D.C.Cir.1990).

31

privacy claim in matters related to official business.
As several courts have recognized, these agents have a
legitimate interest in preserving the secrecy of
matters that conceivably could subject them to
annoyance or harassment in either their official or
private lives.

Id. at 487; see also Dunkelberger v. Department of Justice, 906
F.2d 779, 781 (D.C.Cir.1990) ("Exemption 7(C) takes particular
note of the strong interest of individuals, whether they be
suspects, witnesses, or investigators, in not being associated
unwarrantedly with alleged criminal activity.")(internal
quotation omitted); Computer Professional For Social
Responsibility v. U.S. Secret Service, 72 F.3d 897, 904 (D.C.
Cir. 1996) (The privacy interest of Exemption 7(C) "extends to
persons who are not subjects of the investigation [but who] may
nonetheless have their privacy invaded by having their identities
and information about them revealed in connection with the
investigation")(internal quotation omitted).

Wood does not dispute that at least some privacy interest
exists, and instead focuses his challenge on his assertion of the
public interest at stake.   The FBI released all of its documents
related to the investigation of the FBI employees, thus allowing
public review of the comprehensiveness of the investigation, the
fairness and legitimacy of the decision-making process, and the
range of the disciplinary actions taken.   The sole issue here,
therefore, is whether the public interest in knowing who the
persons involved in the investigation were would serve FOIA's

32

central purpose to "hold governors accountable to the governed." Stern v. FBI, 737 F.2d 84, 92 (D.C. Cir. 1984). If no public interest in the names of the employees is discernable, the redactions would be proper. See Lesar, 636 F.2d at 487 (finding no public interest in the public identification of the lower-level FBI personnel involved in the FBI's investigation of Dr. Martin Luther King, but noting that "[t]his is not to imply a blanket exemption for the names of all FBI personnel in all documents."); Dunkelberger, 906 F.2d at 781 (finding no public interest in disclosure of identifying information where documents at issue were unrelated to "FBI agent's alleged participation in a scheme to entrap a public official"); Stern, 737 F.2d at 93 (finding withholding of names of lower-level employees proper "where the public interest in their identities is grounded only in a general notion of public servant accountability"); Davis v. United States Department of Justice, 968 F.2d 1276, 1282 (D.C. Cir. 1992) ("[E]ven if a particular privacy interest is minor, nondisclosure remains justified where . . . the public interest in disclosure is virtually nonexistent").

Wood offers more than a generalized concern about public accountability, however. He contends that the identifying information in this case would contribute significantly to public understanding of the operations or activities of government, because "[w]hen an agency is investigating itself, with the

33

attendant danger of direct or indirect ties between the investigators and the investigated, the public has a clear interest in knowing not just what was done in the investigation and in the decision making process – but who did it.  The strong force of institutional loyalty that can come into play in such a situation represents another compelling reason for a heightened level of accountability to the public."  Plaintiff's Memorandum in Partial Opposition to Defendants' Motion for Summary Judgment [Doc. # 37] at 5.  In particular, Wood argues at length that the DOJ and FBI officials investigating the misconduct of the FBI agents were themselves biased.  See id. at 13-33.

Allegations of bias or other wrongdoing in the conduct of an investigation, if supported by a proper foundation, may justify public release of the identifying information.  See Castaneda v. United States, 757 F.2d 1010, 1012 (9th Cir. 1995), amended upon denial of panel rehearing, 773 F.2d 251 (9th Cir. 1985) ("Where it appears that the motives or truthfulness of the investigator are in doubt, the public need for supervision and disclosure is necessarily heightened.").  The Second Circuit has established a five part test for determining whether the public interest outweighs the government employee's privacy interests, which examines "(1) the government employee's rank; (2) the degree of wrongdoing and strength of evidence against the employee; (3) whether there are other ways to obtain the information; (4)

34

whether the information sought sheds light on a government

activity; and (5) whether the information sought is related to

job function or is of a personal nature." Perlman v. U.S.

Department of Justice, 312 F.3d 100, 107 (2d Cir. 2002).  Here,

assessing the degree of wrongdoing is the most difficult task.

Because the Second Circuit in Perlman was faced with the

withholding of the identity of the subject of investigation,

there was a record establishing the subject's misconduct before

the Court.  Here, in contrast, there was no investigation of the

investigators, and Wood can only infer misconduct by these

officials on the basis of the investigatory record they prepared.

While Wood's allegations certainly are relevant to the public

interest at stake, to be successful they must be specific and

have some evidentiary support.  Unsupported allegations or

speculation will not suffice.

    Several of Wood's allegations challenge the manner in which

the Office of Professional Responsibility's Adjudication Unit and

the Appeals Unit weighed the evidence before them, which took

place after December 30, 1997.[9]  Of the allegations relevant to

_____

    [9]  For example, Wood challenges the conclusions that Special
Agent DiFonzo did not encourage any special agent or CFTF member
to lie in their affidavits, and that Gregory Dillon, the officer
who accused the agents, "may have been motivated by a political
agenda or animosity."  Wood also provides examples in which, he
argues, the OPR Adjudication Unit treated the falsification of
source material as immaterial as long as the ultimate facts were
proven to be true.  Wood's focus on the decision-makers is
somewhat puzzling, however, as the Court has reviewed the record

35

Exemption 7(C), Wood has three main charges.  First, he states

that the Office of Professional Responsibility investigators

never conducted polygraph tests on the issue of whether Special

agent DiFonzo encouraged others to lie in their affidavits, even

though all officers offered to do so.  Second, Wood states that

the two supervisory special agents who interviewed John F. Healy,

an inspector in the Chief States Attorney's Office, failed to ask

---

and finds that the identities of the decision-makers on the
disciplinary action to be taken against the accused FBI agents
were in fact revealed.  See Letter of C. Frank Figliuzzi, Chief,
Adjudication Unit II, Office of Professional responsibility, May
21, 1998 [Doc. # 18] at 645; Letter of Thomas Lusby, Deputy
Assistant Director, Inspection Division, June 10, 1999 [Doc. #
18] at 699.  Thus, to the extent Wood's allegations of bias are
focused only on how these decision-makers weighed the evidence
before them, or the nature of the resulting sanction, this suit
is no longer the vehicle to address his concerns, as the FBI has
itself already released the names of the decision-makers.
    The names of the higher level officials providing
information and recommendations to the decision-makers were also
revealed.  For example, the FBI New Haven Office submitted a
memorandum to the Office of Professional Responsibility,
recommending that no administrative action be taken against any
of the accused agents.  The released memorandum states that it
was drafted by Gary Rohen and approved by Merrill S. Parks, Jr.
See Memorandum to Office of Professional Responsibility, Feb. 26,
1998 [Doc. # 18] at 621.  Merrill S. Parks was similarly
identified as the author of a memorandum supporting the FBI
agent's appeal of his suspension.  See Memorandum to Inspection
Division, June 1, 1998 [Doc. # 18] at 667.
    The Court has identified only one record redacting the
identities of persons participating in the decision-making
process.  The memorandum of the Appellate Unit evaluating the
merits of the agent's appeal and recommending reducing the
sanction contains redactions of the names of the officials who
drafted, approved, and received it.  See Memorandum to
Inspection, April 30, 1999 [Doc. # 18] at 650.  As this
memorandum was drafted in April 1999, the redactions are subject
only to Exemption 6, and will be addressed infra.

36

him directly if DiFonzo encouraged others to lie.  Third, Wood

faults the failure of the investigators to conduct a file audit

to determine if there were further instances of misrepresentation

in the arrest warrant affidavits other than those identified by

Dillon.  In essence, Wood states that the investigators could

have done more.  Wood has not identified, however, any specific

instances of misconduct, or any evidence affirmatively

demonstrating that the persons carrying out the investigation

were biased or had predetermined the results.

The public interest in knowing how the government has

carried out its duties has been served by the FBI's release of

its records, which has allowed Wood to assess the

comprehensiveness and accuracy of the investigation.  On the

record before the Court, however, there is no further public

interest to be served by releasing the names of the officials

involved in the investigation.  Accordingly, the Court finds that

the names of the DOJ and FBI investigators were properly withheld

under Exemption 7(C).[10]

**2. Exemption 6**

---

[10]Wood has specifically challenged the withholding of the
name of the official identified in the Case Update Form dated
December 11, 1997; and the identities of the FBI Unit Chief and
Case Agent in the Case Update Form dated Nov. 20, 1997.  <u>See</u> Case
Update Forms [Doc. # 17] at 397, 398.  Wood states that this
information is relevant to his contention that the DOJ Memo,
discussed above, was improperly withheld.  Because Wood has
identified no public interest in the disclosure of the names of
these employees, their withholding is likewise proper.

37

Of those records prepared after December 30, 1997 and thus not subject to Exemption 7(C), Exemption 6 may still apply, but only if the withheld information can be deemed part of "detailed Government records on an individual which can be identified as applying to that individual." <u>Washington Post Co.</u>, 456 U.S. at 602. The FBI's withholding of the names of some of the DOJ and FBI employees involved in the investigation and decision-making process does not meet the Exemption 6 threshold. The records at issue apply to the subjects of the investigation, not to the investigators or decision-makers, and thus reveal no detailed personal information about the investigators, as would be present in personnel, medical, or similar files. The declaration the Government has offered in support of withholding these names states that the "public identification of these employees could subject them to harassment or unofficial questioning in the conduct of their official duties or private lives and could lead to the attempted compromise of these employees." Declaration of Carol Keeley, Assistant Section Chief, Record/Information Dissemination Section, FBI, May 27, 2003 [Doc. # 15] at ¶ 15. The declaration does not address, however, how the redaction of the names of agency investigators and decision-makers meets the threshold requirement of Exemption 6. The privacy protection of Exemption 6 is narrower than that of Exemption 7(C), and the names of DOJ and FBI employees in records reflecting the

38

employees' performance of their official duties are not "detailed
Government records on an individual."  The mere name of an agency
employee involved in an investigation but not the subject of the
investigation, therefore, does not qualify for Exemption 6
protection.

   Wood also seeks any information identifying Supervisory
Special Agent Ralph A. Difonzo Jr. as the subject of
administrative disciplinary action or as the subject of any
personnel appeal.  This information does meet the threshold for
Exemption 6 qualification, as he is the subject of the
investigation to which all of the records at issue relate.  The
FBI's redactions of the names of the subjects of the
investigation, when those names were linked to specific findings
or specific forms of discipline would be proper, therefore, if
release would constitute a clearly unwarranted invasion of
personal privacy.

   Wood notes that DiFonzo has been identified as the subject
of the investigation, and has specifically been identified as the
author of a letter appealing a suspension.  See Letter of David
M. Hardy, Chief, Record/Information Dissemination Section,
Records Management Division, FBI, to Alexander Wood, May 27, 2003
[Doc. # 16, Ex. S] at 2 ("[E]nclosed herewith is the letter of
appeal from Ralph DiFonzo, dated June 3, 1998").  Many of the
specific findings against DiFonzo have also been released.  See

39

Office of Professional Responsibility Adjudication Unit Addendum,
May 14, 1998 [Doc. # 18] at 449. Moreover, letters indicating
the disciplinary action DiFonzo received also identify him,
although, as the Government points out, the disclosures may have
been inadvertent since DiFonzo's name was redacted in most
places. See Letter of C. Frank Figliuzzi, May 21, 1998 [Doc. #
18] at 648; Letter of Thomas Lusby, June 10, 1999 [Doc. # 18] at
702. Wood apparently simply seeks confirmation of the
identifying information that has already been released in part.

The balance of interests clearly weighs in favor of release
of the information identifying DiFonzo. DiFonzo served as
Coordinator of the Connecticut Fugitive Task Force and supervised
the other accused special agents. The allegations against the
FBI agents in this task force of falsification of arrest warrant
affidavits were particularly serious. The OPR specifically found
that DiFonzo "made improper use of hearsay" in the affidavits
when failing to reveal information as hearsay, and that he
"relied on assumptions and inferences that resulted in the
inclusion of inaccurate, albeit immaterial, statements of facts
in affidavits." See Office of Professional Responsibility
Adjudication Unit Addendum, May 14, 1998 [Doc. # 18] at 449.
Given his supervisory position and the seriousness of the charge,
there is a strong public interest in information identifying the
specific findings against him and the adequacy of the discipline

40

imposed.  See Perlman, 312 F.3d at 107; Stern, 737 F.2d at 93-94.

Moreover, the fact that the FBI has already released much of the

information Wood is requesting, inconsistently redacting

information identifying DiFonzo, also counsels in favor of

disclosure.  See Steinberg v. U.S. Dep't of Justice, 179 F.R.D.

366, 371 (D.D.C. 1998) ("Having chosen to release the names of

its sources, the Justice Department cannot plausibly argue that

it is still protecting their identities when it withholds the

content of their interviews.").  Because release of information

identifying DiFonzo as the subject of specific findings and

particular disciplinary action under these circumstances would

not constitute a clearly unwarranted invasion of privacy,

withholding under Exemption 6 is not justified.

To conclude, the Court finds that the Government may

withhold the DOJ Memo under Exemption 5.  The Government may also

withhold the identities of the agency employees involved in the

investigation at issue under Exemption 7(C), that is, it may

withhold the names of the employees on those records prepared

prior to the close of the criminal investigation on December 30,

1997.  The government may not withhold the identities of the

employees involved in the investigation or decision-making

process after the close of the criminal investigation, because

these names are not subject to Exemption 6.  The government also

may not withhold the information identifying Special Agent

DiFonzo as the subject of disciplinary action or the subject of any personnel appeal.

## IV.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 19] is GRANTED in part and DENIED in part; Plaintiff's Motion for Partial Summary Judgment [Doc. # 24] is GRANTED in part and DENIED in part; Plaintiff's Motion for Continuance and Discovery Pursuant to Federal Rule of Civil Procedure 56(f) [Doc. # 34] is DENIED; and Plaintiff's Motion to Strike [Doc. # 39], Plaintiff's Second Motion to Strike [Doc. # 43], and Plaintiff's Third Motion to Strike [Doc. # 47] are all DENIED.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut, this 31 day of March, 2004.

42