UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALEXANDER WOOD,<br>    Plaintiff | : | Civil Action No. 3:02-cv-2058(JBA) |
| | : | |
| vs. | : | |
| | : | |
| FEDERAL BUREAU OF<br>    INVESTIGATION and<br>DEPARTMENT OF JUSTICE, | : | |
| | : | |
| Defendants | : | APRIL 14, 2004 |

FOURTH DECLARATION OF ALEXANDER WOOD

I, Alexander Wood, do state and declare as follows:

1.  In accordance with the provisions of 28 U.S.C. Section 1746, I, Alexander Wood, do hereby make the following declaration under penalty of perjury.

2.  I am of sound mind, over age 18, and capable of making this declaration.

3.  All statements herein are made of personal knowledge.

4.  I am the plaintiff in the above-captioned Freedom of Information Act appeal.

5.  While litigating this case, I found on the U.S. Department of Justice ("Department") Web site a publication known as the Freedom of Information Act Guide ("FOIA Guide").

6.  I have used the FOIA Guide primarily as a research tool, but it contains two sections that I thought should be brought directly to the Court's attention in connection with my Motion to Alter or Amend Judgment and for Reconsideration, which I am filing today.

7.  I am attaching one of those sections, at Tab A-1, for the sole purpose of calling the Court's attention to a decision I have been unable to obtain through available

1

databases, *Farese v. U.S. Dep't of Justice,* No. 86-5528 (D.C. Cir. Aug. 12, 1987). That decision is briefly summarized in endnote 531 to a section of the FOIA Guide headed "Litigation Considerations." I have printed out the entire part of that section that appears under the subheading "Considerations on Appeal" and the associated endnotes. But I am attaching at Tab A-1 only three pages of that material, the two pages that contain endnote 531 and the page bearing text associated with that endnote.

8. In addition, I am attaching at Tab A-2 a section of the FOIA Guide headed "FOIA Reading Rooms" with endnotes. I am attaching this material because it provides certain factual information beyond the mere text of the statute and references to court decisions. It explains that "Subsection (a) (2) of the FOIA provides what is commonly referred to as 'reading room' access." Tab A-2 1 (Endnotes omitted.). It also states that "all federal agencies now have FOIA sites on the World Wide Web to serve this 'electronic reading room' function. Tab A-2 2 (Endnote omitted.).

9. Sometime last fall, after all deadlines had passed for documents related to the cross motions for summary judgment in this case, I first looked at the copy of the United States Attorneys' Manual ("Manual") on the Department's Web site. At that time, I discovered Sections 9-27.270 and 9-27.150 of the Manual, both of which I believe are pertinent to this case.

10. On April 7, 2004, I went to the Department's Web site again and printed these sections out, using a computer's "print selection" function to print each section in full but without extraneous material. The copy of Section 9-27.270 that I obtained

2

in that way is at Tab A-3, while the copy of Section 9-27.150 that I so obtained is at Tab A-5.

11. After I first read these sections on the Web last fall, I went to the Connecticut State Library at 231 Capitol Avenue, Hartford, Connecticut 06106 in an effort to find out whether those sections had changed in the period relevant to my case. I found a copy of the Manual dated September 1997. I have compared the texts of Sections 9-27.270 and 9-27.150 in the September 1997 edition of the manual to those currently available on the Department's Web site, and they are the same.

12. The September 1997 edition of Section 9-27.270 is attached at Tab A-4. The September 1997 edition of Section 9-27.150 is attached at Tab A-6.

13. I request that this Court take judicial notice of all six of the attached documents pursuant to Federal Rule of Evidence 201 (d).

14. I declare under penalty of perjury that the foregoing is true and correct.

Executed on _April 14, 2004_
(Date)

_[signature]_
Alexander Wood

3

In sum, the case law on this point simply cannot be reconciled among the various circuits, and conflicting decisions are not uncommon even within the same circuit.

On another issue involving appeal considerations, the Court of Appeals for the District of Columbia Circuit, in a case of first impression, has ruled that the standard of review of a district court decision on that portion of the FOIA's expedited access provision -- which authorizes expedited access "in cases in which the person requesting the records demonstrates a compelling need"[519] -- is de novo.[520] "Precisely because FOIA's terms apply nationwide," the D.C. Circuit decided not to accord deference to any particular agency's interpretation of this provision of the FOIA.[521] At the same time, however, the D.C. Circuit held that if an agency were to issue a rule consistent with the statutory language that permits expedition "in other cases determined by the agency,"[522] that rule would be entitled to judicial deference.[523] In any event, once an agency has acted upon the underlying request for which expedited access was requested, the FOIA itself removes court oversight of the agency's decision on the issue of expedition.[524]

In contrast, it is well settled that a trial court decision refusing to allow discovery will be reversed only if the court abused its discretion.[525] Similarly, a "reverse" FOIA case -- which is brought under the Administrative Procedure Act[526] -- is reviewed only with reference to whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," based upon the "whole [administrative] record."[527] (For a further discussion of this point, see "Reverse" FOIA, below.)

It is noteworthy that in a routine FOIA case where the merits and law of the case are so clear as to justify summary disposition, summary affirmance or reversal may be appropriate.[528] An otherwise routine case, however, could be remanded if the district court fails to make a segregability finding -- even if the district court's decision is in all other respects entirely correct.[529] (For a further discussion of this point, see Litigation Considerations, "Reasonably Segregable" Requirements, above.) Other procedures are available for discharging the appellate court's functions in unusual procedural circumstances.[530]

It also is noteworthy that courts ordinarily will not consider issues raised for the first time on appeal by FOIA litigants.[531] For this reason, agencies should ensure that they raise or preserve all exemption claims at the district court level.[532] Failure to do so may well result in waiver of these claims.[533] (See the discussion of Waiver of Exemption Claims in Litigation, above.)

Lastly, Rule 39(a) of the Federal Rules of Appellate Procedure is applied to award costs to the government when it is successful in a FOIA appeal; the D.C. Circuit has held that this rule's presumption favoring such awards of costs is fully applicable in FOIA cases.[534]

518. See Maine v. United States Dep't of the Interior, 285 F.3d 126, 134 (1st Cir. 2002) (stating that "we cannot say that the district court erred in this case" and also that "[w]e perceive no error by the court"), petition for reh'g en banc filed, No. 01-1234 (1st Cir. May 20, 2002).

519. 5 U.S.C. § 552(a)(6)(E)(i) (2000).

520. Al-Fayed v. CIA, 254 F.3d 300, 305 (D.C. Cir. 2001) (deciding that "the logical conclusion is that de novo review is the proper standard for a district court to apply to a denial of expedition").

521. Id. at 307.

522. Id. at 307 n.7 (citing subsection of 5 U.S.C. § 552(a)(6)(E)(i) that allows for expedition "in other cases determined by the agency").

523. See Al-Fayed, 254 F.3d at 307 n.7 ("A regulation promulgated in response to such an express delegation of authority to an individual agency is entitled to judicial deference . . . as is each agency's reasonable interpretation of its own regulations.").

524. See 5 U.S.C. § 552(a)(6)(E)(iii); see also Judicial Watch, Inc. v. United States Naval Observatory, 160 F. Supp. 2d 111, 112 (D.D.C. 2001) ("[B]ecause defendant has . . . provided a complete response to the request for records, this Court no longer has subject matter jurisdiction over the claim that defendant failed to expedite processing of plaintiff's request.").

525. See Anderson v. HHS, 80 F.3d 1500, 1507 (10th Cir. 1996) (holding that district court decision to deny further discovery on attorney fees issue "was not an abuse of discretion"); Church of Scientology v. IRS, 991 F.2d 560, 562 (9th Cir. 1993), vacated in part on other grounds & remanded, No. 91-15730 (9th Cir. July 14, 1994); Meeropol v. Meese, 790 F.2d 942, 960 (D.C. Cir. 1986); Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 399 (D.C. Cir. 1988).

526. 5 U.S.C. §§ 701-06 (2000).

527. AT&T Info. Sys. v. GSA, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (citing Chrysler Corp. v. Brown, 441 U.S. 281, 318 (1979)); accord Reliance Elec. Co. v. Consumer Prod. Safety Comm'n, 924 F.2d 274, 277 (D.C. Cir. 1991); cf. Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1187 n.6 (8th Cir. 2000) (explaining that review ordinarily is based upon administrative record, but noting that de novo review could be appropriate if it is shown that agency's "factfinding procedures in ["reverse"] FOIA cases are inadequate").

528. See, e.g., Daniel v. Dep't of Justice, No. 01-5119, 2001 WL 1029156, at *1 (D.C. Cir. Aug. 28, 2001) (citing Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam), and Walker v. Washington, 627 F.2d 541, 545 (D.C. Cir. 1980) (per curiam)).

529. See Trans-Pac. Policing Agreement v. United States Customs Serv., 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[T]he District Court had an affirmative duty to consider the segregability issue sua sponte."); see also, e.g., Kimberlin, 139 F.3d at 949-50.

530. See, e.g., Constangy, Brooks & Smith v. NLRB, 851 F.2d 839, 842 (6th Cir. 1988) (determining that it is inappropriate to vacate district court order, after fully complied with, when attorney fees issue pending; proper procedure is to dismiss appeal); Larson v. Executive Office for United States Attorneys, No. 85-6226, slip op. at 4 (D.C. Cir. Apr. 6, 1988) (concluding that when only issue on appeal is mooted, initial lower court order should be vacated without prejudice and case remanded).

531. See, e.g., Drake v. FAA, No. 00-5328, 2001 WL 410463, at *1 (D.C. Cir. Mar. 16, 2001) (denying appellant's motions to amend and for discovery, because "jurisdiction to review the agency's final administrative decision lies in the district court in the first instance"); In re Wathey, No. 98-1589, 1999 WL 151417 (D.C. Cir. 1999) (denying writ of mandamus); Greyshock v. United States Coast Guard, No. 96-15266, 1997 WL 51514, at *3 (9th Cir. Feb. 5, 1997) (declining to consider challenge to separate FOIA request not "mentioned in the complaint or any other pleading before the district

court"); McCutchen v. HHS, 30 F.3d 183, 186-87 (D.C. Cir. 1994) (refusing to consider correctness of agency's interpretation of FOIA request when raised for first time on appeal); see also Students Against Genocide v. Dep't of State, 257 F.3d 828, 835 (D.C. Cir. 2001) (refusing to consider argument made for first time in appellate reply brief); OSHA/Data/C.I.H., Inc. v. United States Dep't of Labor, 220 F.3d 153, 169 n.35 (3d Cir. 2000) (refusing to permit supplementation of record on appeal). But see Trans-Pac. Policing Agreement, 177 F.3d at 1027 (allowing segregability issue to be raised for first time on appeal, in new exception to general rule); Carter v. United States Dep't of Commerce, 830 F.2d 388, 390 n.8 (D.C. Cir. 1987) (considering sua sponte new theories of public interest in Exemption 6 balancing that were not raised by plaintiff at district court); Farese v. United States Dep't of Justice, No. 86-5528, slip op. at 9-10 (D.C. Cir. Aug. 12, 1987) (finding plaintiff not estopped from challenging use of specific exemptions at appellate stage when he argued at trial court level merely that agency had failed to meet its burden of establishing documents exempt).

532. See *FOIA Post*, "Supreme Court Declines to Review Waiver Case" (posted 8/7/01) (advising agencies to pay special attention to "the issue of waiver of FOIA exemptions during the course of litigation"); see also Ryan v. Dep't of Justice, 617 F.2d 781, 792 n.38a (D.C. Cir. 1980) (explaining that raising an exemption means "identifying it at the district court level" and then demonstrating the applicability of any pertinent exemption).

533. See, e.g., August v. FBI, No. 98-5340, 2002 WL 335534, at *1 (D.C. Cir. 2002) ("[T]he government must assert all [FOIA] exemptions . . . at the same time, in the original district court proceedings." (citing Maydak v. United States Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000), cert. denied, 533 U.S. 950 (2001)); Tax Analysts v. IRS, 152 F. Supp. 2d 1, 25-26 (D.D.C. 2001) (refusing to allow an agency to invoke an exemption that it had previously abandoned, noting rule that forbids new exemption claims after "the judge has ruled in the other party's favor" (citing Grumman Aircraft Eng'g Corp. v. Renegotiation Bd., 482 F.2d 710, 721-22 (D.C. Cir. 1973)) (appeal pending); see also *FOIA Post*, "Supreme Court is Asked to Review Law Enforcement Case" (posted 5/30/01) (discussing circumstances of D.C. Circuit's Maydak decision, and describing its "unrealistic approach to the operation of Exemption 7(A)").

534. See Baez v. United States Dep't of Justice, 684 F.2d 999, 1005-07 (D.C. Cir. 1982) (en banc).




# Freedom of Information Act Guide, May 2002

## FOIA READING ROOMS

Subsection (a)(2) of the FOIA[1] provides for what is commonly referred to as "reading room" access.[2] It applies to certain basic agency records that, while not automatically published under subsection (a)(1) of the Act,[3] must routinely be made "available for public inspection and copying" in agency reading rooms.[4] This public inspection obligation applies to all federal agencies, it governs all records covered by subsection (a)(2) except those "offered for sale,"[5] and it extends to the maintenance of "electronic reading rooms" as well.[6] By the same token, records required to be made publicly available pursuant to subsection (a)(2) ordinarily cannot be the subject of regular "FOIA requests."[7]

For the first thirty years of the FOIA's operation, three categories of records -- "final opinions [and] . . . orders" rendered in the adjudication of administrative cases,[8] specific agency policy statements,[9] and certain administrative staff manuals "that affect a member of the public"[10] -- were routinely made available in agency reading rooms.[11] Such records must be indexed by agencies in order to facilitate the public's convenient access to them.[12]

Routine public access to such records serves to guard against the development of agency "secret law" known to agency personnel but not to members of the public who deal with agencies, so records that have no precedential value and do not constitute the working law of the agency are not required to be made available under this part of the Act.[13] Likewise, records that are published and offered for sale by an agency, either directly or indirectly,[14] are not required to be placed in an agency's reading room.[15]

Agencies have made use of their FOIA reading rooms in achieving efficient "affirmative" disclosure of records that otherwise might be sought through less efficient FOIA requests.[16] In so doing, however, they must be mindful of the distinction between subsection (a)(2) records (i.e., "reading room" records) and subsection (a)(3) records (i.e., records subject to standard "FOIA requests") under the Act.[17]

The Electronic Freedom of Information Act Amendments of 1996[18] heavily modified the requirements of subsection (a)(2) by creating a fourth category of "reading room" records,[19] and by establishing a requirement for the electronic availability of "reading room" records in what are referred to as "electronic reading rooms."[20] The Electronic FOIA amendments greatly elevated the role of agency reading rooms -- and, in turn, agency sites on the World Wide Web -- in the processes of FOIA administration.[21]

First, in addition to the traditional three categories of "reading room" records discussed above, agencies must also include any records processed and disclosed in response to a FOIA request that "the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records."(22) Under this provision, when records are disclosed in response to a FOIA request, an agency is required to determine whether they have been the subject of multiple FOIA requests (i.e., two or more additional ones) or, in the agency's best judgment based upon the nature of the records and the types of requests regularly received, are likely to be the subject of multiple requests in the future. (23)

Inasmuch as this requirement by definition begins with the processing of records disclosed in response to a FOIA request, and then is met by multiple other such "requests,"(24) it is the receipt or the anticipation of the third such request that triggers it.(25) If either is the case, then those records in their FOIA-processed form become "reading room" records, which must automatically be made available to potential FOIA requesters.(26) Ideally, this availability will satisfy much of the future public demand for those processed records in a more efficient fashion.(27) Nevertheless, any subsequent FOIA request received for such records has to be responded to in the regular way as well, if the requester so chooses.(28)

Second, the Electronic FOIA amendments require agencies to use electronic information technology to enhance the availability of their "reading room" records: Agencies must make their newly created "reading room" records (i.e., records created by agencies on or after November 1, 1996(29) in all four "reading room" categories) available to the public by "electronic means."(30) The Electronic FOIA amendments embody a strong statutory preference that this new electronic availability be provided by agencies in the form of online, Internet access -- which is most efficient for both agencies and the public alike(31) -- and this expectation has been met by the development of agency FOIA sites on the World Wide Web.(32)

Under the Electronic FOIA amendments, all federal agencies now have FOIA sites on the World Wide Web to serve this "electronic reading room" function,(33) as well as for other FOIA-related purposes.(34) This is a matter of great and growing importance to the processes of FOIA administration.(35) Agencies of such size that they contain sub-agencies or major agency components that administer the FOIA on a decentralized basis and have their own Web sites may maintain multiple "electronic reading rooms," so long as they are linked together clearly and efficiently for Web site users.(36)

Agencies therefore must place in their conventional "paper" reading rooms copies of any FOIA-processed records determined to fall within the fourth subsection (a)(2) category,(37) and must identify such records that were created by them on or after the November 1, 1996 cut-off date in order to make them available through their "electronic reading rooms" as well.(38) In doing so, they should be mindful that some of the records falling under this

fourth category might not have been created by the agency and instead might have been generated elsewhere; while such records may be determined by the agency to fall within subsection (a)(2)(D), they are not "created" by the agency and should not be regarded as subject to the electronic availability requirement.[39] However, an agency may as a matter of administrative discretion choose to make such records available electronically even though they were not generated by the agency, or not created after November 1, 1996, when to do so would be most cost-effective in serving public access needs under subsection (a)(2)(D).[40] Agencies also may make a wide range of other records available through their general World Wide Web sites as a matter of administrative discretion, but in doing so they should make sure that all possible security concerns regarding these records have been carefully considered.[41]

Agencies also should make clear to the users of their "electronic reading rooms" that while all of their subsection (a)(2) records are available in their conventional reading rooms, generally only those records created on or after November 1, 1996 are available in their electronic ones.[42] In addition, they should utilize indices to facilitate use of both types of reading rooms;[43] indeed, they are required by the Electronic FOIA amendments to maintain indexes of the FOIA-processed records in the fourth "reading room" category and to make them available on their FOIA Web sites.[44]

In sum, all agencies should be vigilant in maintaining and augmenting their FOIA Web sites in order to ensure consistent compliance with the Electronic FOIA amendments' important electronic availability requirements.[45]

1. 5 U.S.C. § 552(a)(2) (2000).

2. See FOIA Update, Vol. XIII, No. 3, at 3-4 ("OIP Guidance: The 'Automatic' Disclosure Provisions of FOIA: Subsections (a)(1) & (a)(2)").

3. 5 U.S.C. § 552(a)(1) (providing for Federal Register publication of very basic agency information, as discussed under Introduction, above).

4. 5 U.S.C. § 552(a)(2); see Jordan v. United States Dep't of Justice, 591 F.2d 753, 756 (D.C. Cir. 1978) (en banc) (observing that subsection (a)(2) records must be made "automatically available for public inspection; no demand is necessary"); see also FOIA Update, Vol. XVIII, No. 1, at 4 (advising that large agencies with decentralized FOIA operations may maintain separate reading rooms for agency components).

5. 5 U.S.C. § 552(a)(2).

6. See FOIA Update, Vol. XVII, No. 4, at 1-2 (describing "electronic reading room" requirements under Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, 110 Stat. 3048).

7. See 5 U.S.C. § 552(a)(3)(A) (stating general rule that "FOIA request" under subsection (a)(3) cannot be made for any record that is "made available" under subsections (a)(1) or (a)(2)). But see FOIA Update, Vol. XVIII, No. 1 at 3 (advising of major exception to

general rule for records falling within subsection (a)(2)(D)).

8. 5 U.S.C. § 552(a)(2)(A); see, e.g., NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 155-59 (1975) (holding that NLRB "advice and appeals" memorandum deciding not to file unfair labor complaint was "final opinion" when decision not to file effectively put an end to formal complaint procedure); Rockwell Int'l Corp. v. United States Dep't of Justice, 235 F.3d 598, 603 (D.C. Cir. 2001) (finding that agency report of voluntarily conducted internal investigation into propriety of Rocky Flats prosecution was not "final opinion" because determination of propriety of prosecution was neither "case" nor "adjudication"); Nat'l Prison Project v. Sigler, 390 F. Supp. 789, 792-93 (D.D.C. 1975) (determining that parole board decisions denying inmate applications for parole were "reading room" records).

9. 5 U.S.C. § 552(a)(2)(B); see, e.g., Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 1977) (stating that Social Security rule providing examples of medical conditions to be treated as "per se nonsevere" fell under subsection (a)(2)(B)); Pa. Dep't of Pub. Welfare v. United States, No. 99-175, 2001 U.S. Dist. LEXIS 3492, at *90 (W.D. Pa. Feb. 7, 2001) (holding that HHS documents that advised regional offices of agency's view on policy matters pertaining to certain welfare programs were "interpretations adopted by the agency") (appeal pending); Tax Analysts v. IRS, No. 94-923, 1996 U.S. Dist. LEXIS 3259, at *9 (D.D.C. Mar. 15, 1996) (holding that IRS Field Service Advice Memoranda, even though not binding on IRS personnel, were "statements of policy"), aff'd on other grounds, 117 F.3d 607 (D.C. Cir. 1997); Pub. Citizen v. Office of United States Trade Representative, 804 F. Supp. 385, 387 (D.D.C. 1992) (concluding that agency submissions to trade panel containing agency's interpretation of U.S.'s international legal obligations were "statements of policy and interpretations adopted by the [agency]"); see also Vietnam Veterans of Am. v. Dep't of the Navy, 876 F.2d 164, 165 (D.C. Cir. 1989) (finding that opinions in which Judge Advocates General of Army and Navy have authority only to dispense legal advice -- rendered in subject areas for which those officials do not have authority to act on behalf of agency -- were not "statements of policy or interpretations adopted by" those agencies and were not required to be published or made available for public inspection).

10. 5 U.S.C. § 552(a)(2)(C); see, e.g., Sladek v. Bensinger, 605 F.2d 899, 901 (5th Cir. 1979) (finding portions of DEA agents manual concerning treatment of confidential informants and search warrant procedures to be subsection (a)(2)(C) records); Stokes v. Brennan, 476 F.2d 699, 701 (5th Cir. 1973) (determining that "Training Course for Compliance Safety and Health Officers," including all instructor and student manuals, training slides, films, and visual aids, must be made available for public inspection and copying); Firestone Tire & Rubber Co. v. Coleman, 432 F. Supp. 1359, 1364-65 (N.D. Ohio 1976) (ruling that memoranda approved by Office of Standards Enforcement, which set forth agency's policy regarding sampling plans that office must follow when tire fails lab test under Federal Motor Vehicle Safety Standards were "reading room" records); see also Stanley v. DOD, No. 98-CV-4116, slip op. at 9-10 (S.D. Ill. June 22, 1999) (finding that administrative staff manuals pertaining to military hospital procedures did not "affect the public" and were not required to be given "reading room" treatment) (appeal pending).

11. See FOIA Update, Vol. XIII, No. 3, at 4 (describing categories of records required to be placed in agency reading rooms); see also id. (noting that "an agency may withhold any record or record portion falling within subsection (a)(2) . . . if it is of such sensitivity as to fall within a FOIA exemption") (citing, e.g., Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 n.21 (1975)).

12. See 5 U.S.C. § 552(a)(2); see, e.g., Irons & Sears v. Dann, 606 F.2d 1215, 1223 (D.C. Cir. 1979) (requiring agency to provide "reasonable index" of requested decisions); Taxation With Representation Fund v. IRS, 2 Gov't Disclosure Serv. (P-H) ¶ 81,028, at

81,080 (D.D.C. Apr. 22, 1980) (recognizing agency's "continuing duty" to make subsection (a)(2) records and indices available); see also Pa. Dep't of Pub. Welfare, 2001 U.S. Dist. LEXIS 3492, at *82 (finding agency in violation of indexing requirement because index was incomplete and it was "nearly impossible" to distinguish precedential material from obsolete material). See generally FOIA Update, Vol. XVII, No. 4, at 2 (discussing statutory indexing requirements under Electronic FOIA amendments). But cf. Tax Analysts v. IRS, No. 94-923, 1998 WL 419755, at *5 (D.D.C. May 1, 1998) (confusingly concluding that court has "no statutory authority for actually ordering . . . a remedy" regarding indexing requirement), appeal dismissed voluntarily, No. 94-5252 (D.C. Cir. Aug. 11, 1998).

13. See Sears, 421 U.S. at 153-54 (observing that the reading room provision "represents a strong congressional aversion to 'secret [agency] law,' . . . and represents an affirmative congressional purpose to require disclosure of documents which have 'the force and effect of law'" (quoting H.R. Rep. No. 89-1497, at 7 (1966))); Skelton v. United States Postal Serv., 678 F.2d 35, 41 (5th Cir. 1982) ("That requirement was designed to help the citizen find agency statements 'having precedential significance' when he becomes involved in 'a controversy with an agency.'" (quoting H.R. Rep. No. 89-1497, at 8)); Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act 19 (Feb. 1975) (explaining that the "primary purpose of subsection (a)(2) was to compel disclosure of what has been called 'secret law,' or as the 1966 House Report put it, agency materials which have 'the force and effect of law in most cases'" (quoting H.R. Rep. No. 89-1497, at 7)); Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 15 (June 1967) [hereinafter Attorney General's 1967 FOIA Memorandum] (advising that keeping "orders available in reading rooms . . . [that] have no precedential value, often would be impracticable and would serve no useful purpose"); see also Smith v. NTSB, 981 F.2d 1326, 1328 (D.C. Cir. 1993) (stating that the purpose of this "requirement is obviously to give the public notice of what the law is so that each individual can act accordingly"); Vietnam Veterans of Am., 876 F.2d at 165 (rejecting argument that legal opinions issued by Judge Advocates General of Army and Navy must be placed in agency reading room, because those opinions are not statements of policy that "operate as law"); Pa. Dep't of Pub. Welfare, 2001 U.S. Dist. LEXIS 3492, at *78 (holding that a FOIA reading room index "must include those matters that the agency considers to be of precedential value"); Stanley, No. 98-CV-4116, slip op. at 9-10 (S.D. Ill. June 22, 1999) (holding that administrative staff manuals that do not have any "precedential significance" and would not assist members of the public in "tailor[ing] their behavior to the law" are not required to be made publicly available in agency reading room). But see Nat'l Prison Project, 390 F. Supp. at 793 (ruling otherwise prior to Supreme Court's instructive emphasis on legislative history of subsection (a)(2) in Sears); Tax Analysts & Advocates v. IRS, 362 F. Supp. 1298, 1303 (D.D.C. 1973) (same), modified & remanded on other grounds, 505 F.2d 350 (D.C. Cir. 1974).

14. See, e.g., Uniform Freedom of Information Act Fee Schedule and Guidelines, 52 Fed. Reg. 10,018 (1987) (recognizing National Technical Information Service (commonly known as "NTIS") as "statutory-based" government record distribution program); cf. White House Memorandum for Heads of Executive Departments and Agencies Concerning Safeguarding Information Regarding Weapons of Mass Destruction and Other Sensitive Documents Related to Homeland Security (Mar. 19, 2002) [hereinafter White House Homeland Security Memorandum], reprinted in *FOIA Post* (posted 3/21/02) (requiring agencies to exercise special care in distributing information through Defense Technical Information Center (commonly known as "DTIC"), particularly regarding development of weapons of mass destruction, in light of heightened homeland security concerns).

15. See, e.g., Gaunce v. Burnett, 849 F.2d 1475, 1475 (9th Cir. 1988) (unpublished table decision) (finding assessment of $13.25 for copy of FAA order proper, notwithstanding its subsection (a)(2) character, because "FOIA allows copies of orders to be 'offered for sale'"); Jackson v. Heckler, 580 F. Supp. 1077, 1081 (E.D. Pa. 1984) (holding that Social

Security ruling relied on by administrative law judge need not be made "available for inspection and copying" pursuant to subsection (a)(2)(B) because it was "published for sale"); see also FOIA Update, Vol. XVII, No. 4, at 1 (noting that "reading room" obligation does not apply to any records that "are promptly published and [are] offered for sale") (quoting 5 U.S.C. § 552(a)(2)); Attorney General's 1967 FOIA Memorandum 15 (noting that "[t]his is to afford the agency 'an alternative means of making these materials available through publication'" (quoting S. Rep. No. 89-813, at 7 (1966))).

16. See, e.g., FOIA Update, Vol. XIX, No. 1, at 1 (discussing Department of the Air Force affirmative electronic information disclosure program); see also FOIA Update, Vol. XVI, No. 1, at 1-2 (promoting "affirmative" agency disclosure practices through "reading room" access, among other means).

17. See, e.g., FOIA Update, Vol. XVI, No. 1, at 2 (reminding that "an agency cannot convert a subsection (a)(3) record into a subsection (a)(2) record (which cannot be the subject of a FOIA request under subsection (a)(3)) just by voluntarily placing it into its reading room"); FOIA Update, Vol. XII, No. 2, at 5 (advising that FOIA requesters may not be deprived of subsection (a)(3) access rights through voluntary "reading room" availability); see also Crews v. Internal Revenue, No. 99-8388, slip op. at 11-12 (C.D. Cal. Apr. 26, 2000) (declaring that policy statements and administrative staff manuals made available under subsection (a)(2) are not required to be made available in response to subsection (a)(3) requests); Reeves v. United States, No. 94-1291, 1994 WL 782235, at *1 (E.D. Cal. Nov. 16, 1994) (describing different treatment of subsection (a)(1), (a)(2), and (a)(3) records under Act). But see FOIA Update, Vol. XVIII, No. 1, at 3 (advising of exception to general rule for records in fourth "reading room" category); cf. Tax Analysts, 1998 WL 419755, at *4 (failing to apprehend statutory distinction between records subject to subsection (a)(2) and those subject to subsection (a)(3)).

18. Pub. L. No. 104-231, 110 Stat. 3048.

19. See 5 U.S.C. § 552(a)(2)(D).

20. See id. § 552(a)(2); see also FOIA Update, Vol. XIX, No. 4, at 4-5 (emphasizing importance of "electronic reading rooms" in satisfying FOIA obligations); FOIA Update, Vol. XVII, No. 4, at 1-2 (discussing statutory changes).

21. See FOIA Post, "Agencies Continue E-FOIA Implementation" (posted 3/14/01) (advising of growing attention being paid to agencies' "electronic reading rooms"); see also FOIA Post, "GAO E-FOIA Implementation Report Issued" (posted 3/23/01) (describing GAO report's emphasis on agency compliance with "electronic reading room" obligations); FOIA Update, Vol. XIX, No. 3, at 1 (describing 1998 congressional hearing on agency amendment-implementation activities).

22. 5 U.S.C. § 552(a)(2)(D).

23. See FOIA Update, Vol. XVIII, No. 1, at 3-4 (advising on processes for exercise of agency judgment under fourth "reading room" category).

24. 5 U.S.C. § 552(a)(2)(D) (speaking of "requests" in plural form, above and beyond FOIA request already received).

25. See FOIA Update, Vol. XVII, No. 4, at 1 (describing subsection (a)(2)(D) obligations); see also FOIA Update, Vol. XVIII, No. 1, at 3-4 (same). But see also FOIA Update, Vol. XVIII, No. 2, at 2 (advising that agencies need not include records processed for "flurry" of contemporaneous multiple requests when they are not likely to be requested again --

e.g., requests for certain types of routine government contract submissions).

26. See FOIA Update, Vol. XVII, No. 4, at 1-2 (discussing operation of subsection (a)(2)); see also FOIA Update, Vol. XIX, No. 1, at 3-4 (compilation of OIP policy guidance regarding "reading room" matters); cf. Tax Analysts, 1998 WL 419755, at **4, 6 (requiring agency to place exceptionally large volume of FOIA-processed records in reading room on weekly basis, as they are processed, rather than all at once at conclusion of lengthy processing period). But see FOIA Update, Vol. XVIII, No. 1, at 3 (cautioning that any information about any first-party requester that would not be disclosed to any other FOIA requester, such as information protected by Privacy Act of 1974, 5 U.S.C. § 552a (2000), or Trade Secrets Act, 18 U.S.C. § 1905 (2000), would not be appropriate for automatic public disclosure under fourth "reading room" category).

27. See FOIA Update, Vol. XVIII, No. 2, at 2 (citing H.R. Rep. No. 104-795, at 21 (1996)); see also FOIA Update, Vol. XVII, No. 4, at 1 (emphasizing connection between fourth "reading room" category and "electronic reading room" mechanism in meeting public access demands); cf. President's Statement on Signing the Electronic Freedom of Information Act Amendments of 1996, 32 Weekly Comp. Pres. Doc. 1949 (Oct. 7, 1996), reprinted in FOIA Update, Vol. XVII, No. 4, at 9 (expressing "hope that there will be less need to use FOIA to obtain government information").

28. See FOIA Update, Vol. XVIII, No. 1, at 3 (advising that while ordinary rule is that records placed in reading room under subsection (a)(2) cannot be subject of regular FOIA request, Congress made clear that such rule does not apply to fourth "reading room" category of FOIA-processed records) (citing H.R. Rep. No. 104-795, at 21 (1996)).

29. See 5 U.S.C. § 552(a)(2); see also FOIA Update, Vol. XVIII, No. 1, at 4-5.

30. 5 U.S.C. § 522(a)(2); see FOIA Update, Vol. XVIII, No. 1, at 3 (advising that records made available in "electronic reading rooms" must nevertheless be made available in conventional "paper" reading rooms as well) (citing H.R. Rep. No. 104-795, at 21 (1996)); see also id. (suggesting that computer terminals may be used to facilitate such "reading room" access).

31. See 5 U.S.C. § 552(a)(2) (stressing use of "computer telecommunications" and establishing absolute requirement of Internet use by all agencies); see also FOIA Update, Vol. XIX, No. 4, at 4-5 (emphasizing importance of "new partnership" between agency FOIA officers and agency Information Resources Management (IRM) personnel to achieve efficient disclosure through electronic means); FOIA Update, Vol. XVIII, No. 3, at 1-2 (describing efficiency of online public access).

32. See FOIA Post, "GAO E-FOIA Implementation Report Issued" (posted 3/23/01) (recognizing universal development of agency FOIA Web sites, but nonetheless urging "careful vigilance in both the establishment and the augmentation of agency FOIA Web sites with the passage of time").

33. 5 U.S.C. § 552(a)(2); see FOIA Post, "Supplemental Guidance on Annual FOIA Reports" (posted 8/13/01) (recognizing that all federal agencies now have established Web sites for FOIA purposes); FOIA Update, Vol. XIX, No. 3, at 3-4 ("OIP Guidance: Recommendations for FOIA Web Sites"); FOIA Update, Vol. XIX, No. 2, at 2 ("Web Site Watch" discussion of agency FOIA Web sites); FOIA Update, Vol. XIX, No. 1, at 2 (same); FOIA Update, Vol. XVIII, No. 3, at 1-2 (describing early agency development of World Wide Web sites for FOIA-related purposes, including "electronic reading rooms").

34. See, e.g., 5 U.S.C. § 552(e)(2) (setting forth requirement that each agency make its

annual FOIA report available to public electronically); see also FOIA Update, Vol. XIX, No. 3, at 3-4 (recommending basic elements and features of agency FOIA Web sites); cf. FOIA Update, Vol. XIX, No. 1, at 6 (encouraging agencies to consider as matter of administrative discretion establishing capability to receive FOIA requests via Internet).

35. See FOIA Update, Vol. XIX, No. 4, at 5 (observing that "an agency's FOIA Web site has become an essential means by which its FOIA obligations are satisfied," so FOIA Web site support "should be a primary mission of each agency's IRM staff"); FOIA Update, Vol. XIX, No. 3, at 1 (describing congressional interest in agency Web site development for purposes of FOIA administration); id. at 1, 3 (describing governmentwide attention to same). See generally FOIA Post, "GAO to Update Its E-FOIA Implementation Study" (posted 3/8/02).

36. See FOIA Update, Vol. XIX, No. 3, at 3 (advising that "[c]larity to the [W]eb site user is essential to the effectiveness of the site"); FOIA Update, Vol. XIX, No. 1, at 6 (advising on use of FOIA Web sites by all agency components "once an agency has established its World Wide Web capability"); FOIA Update, Vol. XVIII, No. 1, at 4 (advising that agencies with separate "electronic reading rooms" for separate components "should ensure that [they] are linked together electronically so as to facilitate efficient user access"); see also FOIA Update, Vol. XIX, No. 3, at 4 (recommending that agencies check both accuracy and viability of their FOIA Web site links and text content of their FOIA Web site home pages on regular basis).

37. See FOIA Update, Vol. XVIII, No. 1, at 4 (advising that agencies may determine that records no longer fall within fourth "reading room" category after passage of time).

38. See FOIA Update, Vol. XVIII, No. 1, at 5 (advising that redaction of record during FOIA processing does not amount to record "creation" for purposes of determining applicability of electronic availability requirement); see also FOIA Update, Vol. XVII, No. 4, at 2 (observing that in case of FOIA-processed records, very large proportion of those records will have been created prior to November 1, 1996 "cut-off" date, until long after Electronic FOIA amendments' initial implementation, and therefore will not be subject to electronic availability requirement).

39. See FOIA Update, Vol. XVIII, No. 1, at 4-5 (citing United States Dep't of Justice v. Tax Analysts, 492 U.S. 136, 144 (1989)); see also 63 Fed. Reg. 29,591, 29,592 (1998) (discussing Department of Justice regulation on point, currently at 28 C.F.R. § 16.2(c) (2001)).

40. See FOIA Update, Vol. XIX, No. 1, at 4; see, e.g., FOIA Update, Vol. XIX, No. 3, at 5. But see FOIA Update, Vol. XVIII, No. 1, at 5 (cautioning agencies to guard against possibility that "electronic reading room" treatment of record generated by outside party might be regarded as copyright infringement by that party).

41. See, e.g., White House Homeland Security Memorandum, reprinted in FOIA Post (posted 3/21/02) (requiring agencies to ensure appropriate protection of information relating to weapons of mass destruction and of other sensitive homeland security-related information); accord Attorney General's Memorandum for Heads of All Federal Departments and Agencies Regarding the Freedom of Information Act (Oct. 12, 2001), reprinted in FOIA Post (posted 10/15/01) (urging agencies to "carefully consider" the protection of fundamental societal values, including "safeguarding our national security").

42. See FOIA Update, Vol. XIX, No. 3, at 4; FOIA Update, Vol. XII, No. 4, at 2; see also FOIA Update, Vol. XVIII, No. 2, at 2 (advising agencies on practical treatment of written signatures on adjudicatory orders for "electronic reading room" purposes).

43. See FOIA Update, Vol. XIX, No. 3, at 4 (recommending use of "visible links" for electronic indexing purposes); cf. FOIA Update, Vol. XVIII, No. 3, at 1-2 (describing early agency use of "home pages" and electronic "links" for FOIA-related purposes on agency World Wide Web sites).

44. 5 U.S.C. § 552(a)(2)(E); cf. FOIA Update, Vol. XVIII, No. 3, at 3-7 (setting forth Justice Department guidelines for agency preparation and submission of revised form of annual FOIA reports, as required to be prepared by all agencies electronically and made available on FOIA Web sites); FOIA Update, Vol. XIX, No. 3, at 2 (advising agencies on proper FOIA Web site treatment of annual FOIA reports, in compliance with electronic availability requirements of 5 U.S.C. § 552(e)(2)-(3), including through agency identification of Uniform Resource Locator (URL) for each report).

45. See *FOIA Post*, "GAO E-FOIA Implementation Report Issued" (posted 3/23/01) (advising that agencies must take all steps necessary to "both attain[] and maintain[] proper compliance with all of [the FOIA's] electronic availability requirements").

Go to: Table of Contents

### 9-27.270 Records of Prosecutions Declined

A. Whenever the attorney for the government declines to commence or recommend Federal prosecution, he/she should ensure that his/her decision and the reasons therefore are communicated to the investigating agency involved and to any other interested agency, and are reflected in the office files.

B. Comment. USAM 9-27.270 is intended primarily to ensure an adequate record of disposition of matters that are brought to the attention of the government attorney for possible criminal prosecution, but that do not result in Federal prosecution. When prosecution is declined in serious cases on the understanding that action will be taken by other authorities, appropriate steps should be taken to ensure that the matter receives their attention and to ensure coordination or follow-up.

not because it is anticipated that any attorney for the government might allow them to affect his/her judgment, but in order to make clear that Federal prosecutors will not be influenced by such improper considerations. Of course, in a case in which a particular characteristic listed in subparagraph (1) is pertinent to the offense (for example, in an immigration case the fact that the offender is not a United States national, or in a civil rights case the fact that the victim and the offender are of different races), the provision would not prohibit the prosecutor from considering it for the purpose intended by the Congress.

### 9-27.270 Records of Prosecutions Declined

A. Whenever the attorney for the government declines to commence or recommend Federal prosecution, he/she should ensure that his/her decision and the reasons therefore are communicated to the investigating agency involved and to any other interested agency, and are reflected in the office files.

B. Comment. USAM 9-27.270 is intended primarily to ensure an adequate record of disposition of matters that are brought to the attention of the government attorney for possible criminal prosecution, but that do not result in Federal prosecution. When prosecution is declined in serious cases on the understanding that action will be taken by other authorities, appropriate steps should be taken to ensure that the matter receives their attention and to ensure coordination or follow-up.

### 9-27.300 Selecting Charges -- Charging Most Serious Offenses

A. Except as provided in USAM 9-27.330, (precharge plea agreements), once the decision to prosecute has been made, the attorney for the government should charge, or should recommend that the grand jury charge, the most serious offense that is consistent with the nature of the defendant's conduct, and that is likely to result in a sustainable conviction. If mandatory minimum sentences are also involved, their effect must be considered, keeping in mind the fact that a mandatory minimum is statutory and generally overrules a guideline. The "most serious" offense is generally that which yields the highest range under the sentencing guidelines.

However, a faithful and honest application of the Sentencing Guidelines is not incompatible with selecting charges or entering into plea agreements on the basis of an individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the Federal criminal code, and maximize the impact of Federal resources on crime. Thus, for example, in determining "the most serious offense that is consistent with the nature of the defendant's conduct that is likely to result in a sustainable conviction," it is appropriate that the attorney for the government consider, inter alia, such factors as the Sentencing Guideline range yielded by the charge, whether the penalty yielded by such sentencing range (or potential mandatory minimum charge, if applicable) is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation. Note that these factors may also be considered by the attorney for the government when entering into plea agreements. USAM 9-27.400.

To ensure consistency and accountability, charging and plea agreement decisions must be made at an appropriate level of responsibility and documented with an appropriate record of the factors applied.

B. Comment. Once it has been determined to initiate prosecution, either by filing a complaint or an information, or by seeking an indictment from the grand jury, the attorney for the government must determine what charges to file or recommend. When the conduct in question consists of a single criminal act, or when there is only one applicable statute, this is not a difficult task. Typically, however, a defendant will have committed more than one criminal act and his/her conduct may be prosecuted under

### 9-27.150 Non-Litigability

A. The principles set forth herein, and internal office procedures adopted pursuant hereto, are intended solely for the guidance of attorneys for the government. They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by a party to litigation with the United States.

B. Comment. This statement of principles has been developed purely as matter of internal Departmental policy and is being provided to Federal prosecutors solely for their own guidance in performing their duties. Neither this statement of principles nor any internal procedures adopted by individual offices pursuant hereto creates any rights or benefits. By setting forth this fact explicitly, USAM 9-27.150 is intended to foreclose efforts to litigate the validity of prosecutorial actions alleged to be at variance with these principles or not in compliance with internal office procedures that may be adopted pursuant hereto. In the event that an attempt is made to litigate any aspect of these principles, or to litigate any internal office procedures adopted pursuant to these materials, or to litigate the applicability of such principles or procedures to a particular case, the United States Attorney concerned should oppose the attempt and should notify the Department immediately.

principles has been authorized pursuant to USAM 9-27.140. However, it is not intended that reference to these principles will require a particular prosecutorial decision in any given case. Rather, these principles are set forth solely for the purpose of assisting attorneys for the government in determining how best to exercise their authority in the performance of their duties.

### 9-27.130 Implementation

A. Each United States Attorney and responsible Assistant Attorney General should establish internal office procedures to ensure:

1. That prosecutorial decisions are made at an appropriate level of responsibility, and are made consistent with these principles; and

2. That serious, unjustified departures from the principles set forth herein are followed by such remedial action, including the imposition of disciplinary sanctions, when warranted, as are deemed appropriate.

B. Comment. Each United States Attorney and each Assistant Attorney General responsible for the enforcement of Federal criminal law should supplement the guidance provided by the principles set forth herein by establishing appropriate internal procedures for his/her office. One purpose of such procedures should be to ensure consistency in the decisions within each office by regularizing the decision making process so that decisions are made at the appropriate level of responsibility. A second purpose, equally important, is to provide appropriate remedies for serious, unjustified departures from sound prosecutorial principles. The United States Attorney or Assistant Attorney General may also wish to establish internal procedures for appropriate review and documentation of decisions.

### 9-27.140 Modifications or Departures

A. United States Attorneys (USA) may modify or depart from the principles set forth herein as necessary in the interests of fair and effective law enforcement within the district. Any significant modification or departure contemplated as a matter of policy or regular practice must be approved by the appropriate Assistant Attorney General and the Deputy Attorney General.

B. Comment. Although these materials are designed to promote consistency in the application of Federal criminal laws, they are not intended to produce rigid uniformity among Federal prosecutors in all areas of the country at the expense of the fair administration of justice. Different offices face different conditions and have different requirements. In recognition of these realities, and in order to maintain the flexibility necessary to respond fairly and effectively to local conditions, each United States Attorney is specifically authorized to modify or depart from the principles set forth herein, as necessary in the interests of fair and effective law enforcement within the district. In situations in which a modification or departure is contemplated as a matter of policy or regular practice, the appropriate Assistant Attorney General and the Deputy Attorney General must approve the action before it is adopted.

### 9-27.150 Non-Litigability

A. The principles set forth herein, and internal office procedures adopted pursuant hereto, are intended solely for the guidance of attorneys for the government. They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by a party to litigation with the United States.

B. Comment. This statement of principles has been developed purely as matter of internal Departmental policy and is being provided to Federal prosecutors solely for their own guidance in performing their

duties. Neither this statement of principles nor any internal procedures adopted by individual offices pursuant hereto creates any rights or benefits. By setting forth this fact explicitly, USAM 9-27.150 is intended to foreclose efforts to litigate the validity of prosecutorial actions alleged to be at variance with these principles or not in compliance with internal office procedures that may be adopted pursuant hereto. In the event that an attempt is made to litigate any aspect of these principles, or to litigate any internal office procedures adopted pursuant to these materials, or to litigate the applicability of such principles or procedures to a particular case, the United States Attorney concerned should oppose the attempt and should notify the Department immediately.

## 9-27.200 Initiating and Declining Prosecution -- Probable Cause Requirement

A. If the attorney for the government has probable cause to believe that a person has committed a Federal offense within his/her jurisdiction, he/she should consider whether to:

1. Request or conduct further investigation;
2. Commence or recommend prosecution;
3. Decline prosecution and refer the matter for prosecutorial consideration in another jurisdiction;
4. Decline prosecution and initiate or recommend pretrial diversion or other non-criminal disposition; or
5. Decline prosecution without taking other action.

B. Comment. USAM 9-27.210 sets forth the courses of action available to the attorney for the government once he/she has probable cause to believe that a person has committed a Federal offense within his/her jurisdiction. The probable cause standard is the same standard as that required for the issuance of an arrest warrant or a summons upon a complaint (*See* Fed. R. Crim. P. 4(a)), for a magistrate's decision to hold a defendant to answer in the district court (*See* Fed. R. Crim. P. 5.1(a)), and is the minimal requirement for indictment by a grand jury. *See Branzburg v. Hayes*, 408 U.S. 665, 686 (1972). This is, of course, a threshold consideration only. Merely because this requirement can be met in a given case does not automatically warrant prosecution; further investigation may be warranted, and the prosecutor should still take into account all relevant considerations, including those described in the following provisions, in deciding upon his/her course of action. On the other hand, failure to meet the minimal requirement of probable cause is an absolute bar to initiating a Federal prosecution, and in some circumstances may preclude reference to other prosecuting authorities or recourse to non-criminal sanctions as well.

## 9-27.220 Grounds for Commencing or Declining Prosecution

A. The attorney for the government should commence or recommend Federal prosecution if he/she believes that the person's conduct constitutes a Federal offense and that the admissible evidence will probably be sufficient to obtain and sustain a conviction, unless, in his/her judgment, prosecution should be declined because:

1. No substantial Federal interest would be served by prosecution;
2. The person is subject to effective prosecution in another jurisdiction; or
3. There exists an adequate non-criminal alternative to prosecution.

B. Comment. USAM 9-27.220 expresses the principle that, ordinarily, the attorney for the government should initiate or recommend Federal prosecution if he/she believes that the person's conduct constitutes a Federal offense and that the admissible evidence probably will be sufficient to obtain and sustain a